**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JYOTINDRA PATEL,<br>10906 N. Sand Canyon Place<br>Oro Valley, AZ 85737<br><br>Individually and On Behalf of All Others<br>Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MALLINCKRODT PLC,<br>675 McDonnell Blvd.<br>Hazelwood, MO 63042<br><br>and MARK TRUDEAU,<br>c/o Mallinckrodt PLC 675 McDonnell Blvd.<br>Hazelwood, MO 63042<br><br>Defendants. | Civil Action No.:<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Jyotindra Patel ("Plaintiff"), by his attorneys, except for his own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Mallinckrodt plc ("Mallinckrodt" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

**NATURE OF THE ACTION**

1.      This is a securities class action on behalf of all persons who purchased Mallinckrodt common stock between November 25, 2014, and January 18, 2017, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are asserted against Mallinckrodt and its current Chief Executive Officer ("CEO"), Mark Trudeau ("Trudeau"), who made materially false and misleading statements during the Class Period in press releases, analyst and investor conference calls, and SEC filings.

2.      Mallinckrodt is a public limited company organized in Ireland with its U.S. headquarters in St. Louis, Missouri. Mallinckrodt manufactures and distributes products used in diagnostic procedures and in the treatment of pain and related conditions. This includes the development, manufacture and distribution of specialty pharmaceuticals, active pharmaceutical ingredients, contrast products and radiopharmaceuticals. The Company trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MNK."

3.      For years, Mallinckrodt maintained a monopoly over the only therapeutic preparation of adrenocorticotropic hormone ("ACTH") in the United States approved by the U.S. Food and Drug Administration (the "FDA").  ACTH is a treatment for 19 different conditions, including infantile spasms, and difficult-to-treat autoimmune and inflammatory conditions. Mallinckrodt acquired the monopoly following its August 2014 acquisition of Questcor Pharmaceuticals, Inc. ("Questcor") in a $5.6 billion transaction, and thereby, the acquisition of HP Acthar Gel ("Acthar"), an injectable ACTH made from pigs' pituitary glands.

4.      In Europe, Canada, and other parts of the world, doctors treat patients suffering from similar conditions with Synacthen Depot ("Synacthen"), a synthetic ACTH drug. Although Acthar is a natural ACTH drug derived from the pituitary glands of pigs, Acthar and Synacthen

2

have very similar biological activities and pharmacological effects. Indeed, Questcor considered the drugs so similar that it submitted Synacthen information to support its application to the FDA to expand the label indications for Acthar and cited Synacthen studies in its Acthar marketing materials.

5.      Until June 2013, Novartis AG ("Novartis") marketed and sold Synacthen abroad and in the U.S., providing a meaningful competitor to Acthar which suppressed prices.  In June 2013, however, Questcor outbid other companies to acquire the U.S. rights to Synacthen and thereafter, repeatedly increased the price of Acthar 85,000% from $40 per vial in 2001, to over $34,000 per vial in 2017. As a result, Medicare spent more money per patient on Acthar than for any other drug in 2015, putting out $504 million for just 3,104 patients, according to the Medicare Drug Spending Dashboard.  These exorbitant prices figures make Acthar one of the most expensive drugs on the market, and currently the single most expensive drug reimbursed by both Medicare and Medicaid.

6.      Despite the obvious exploitive effects of such a monopoly on consumers and United States payers, the monopoly has provided a substantial boon to the Company's bottom line year-over-year.  Throughout the Class Period, Defendants reported impressive revenue, operating profit growth and sales growth, and informed investors that Acthar accounted for 34 percent of Mallinckrodt's $3.4 billion in net sales for fiscal 2016.  All the while, however, Defendants knew that Mallinckrodt's aggressive pricing model produced unsustainable revenues, and its inflated earnings and forecasts concealed the true extent of the pricing pressures the Company was experiencing and the exposure of Acthar to reimbursement rates by Medicare and Medicaid.

7.      Thus, after years of consistently raising prices for Acthar, the monopoly Mallinckrodt had created began to experience significant pressure from United States payers such

as Medicare and Medicaid beginning in at least 2012. Senator Amy Klobuchar, a Minnesota Democrat, for example, criticized the sharp price increase as early as 2008 and a September 2016 article at ValueWalk entitled "The Government Should Focus on Mallinckrodt" described the Company's pricing practices as "one of the most appalling pharmaceutical stories in history."

8.      Notwithstanding this increasing pricing pressure, throughout the Class Period, Mallinckrodt and Defendant Trudeau continued to misrepresent the efficacy of Mallinckrodt's business model and its ability to maintain sustainable revenue. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that Acthar's monopoly status as the only FDA-approved ACTH preparation was the product of unlawful anticompetitive practices and failed to disclose that its increasing reliance on Medicare and Medicaid meant that the Company's monopolistic Acthar revenue would be threatened if the government took action to limit the price paid for the drug by taxpayers.

9.      For instance, shortly after Mallinckrodt completed the acquisition of Questcor, the Company stated in its 2014 Form 10-K filed with the SEC on November 25, 2014 (the "2014 10-K"), that Acthar "has limited direct competition due to the unique nature of the product." However, the Company failed to disclose that its Acthar revenues were in fact the product of its monopolistic efforts to prevent an alternative ACTH treatment from being introduced in the U.S. market, a practice that clearly violated U.S. antitrust laws and one that the Company would later foreseeably be forced to abandon.

10.     The 2014 10-K also stated that "federal and state governments may continue to enact measures in the future aimed at containing or reducing payment levels for prescription pharmaceuticals paid for in whole or in part with government funds. We cannot predict the nature of such measures, which could have material adverse consequences for the pharmaceutical

industry as a whole and, consequently, also for us." This warning, however, omitted the fact that the Company's increasing reliance on Medicare and Medicaid for over 60% of Acthar's sales meant that the Company was highly exposed to changes in reimbursement levels for these programs. As such, this statement created a materially false and misleading impression of the true nature of, and specific risks to, Mallinckrodt due to its exposure to Medicare and Medicaid reimbursement levels.

11.     The Company's aggressive pricing and monopolization strategy first hit a major stumbling block beginning in the summer of 2015, when the high costs (and very substantial cost increases) for certain drugs became a national issue. Against this background, on an October 6, 2015 conference call with investors, Defendant Trudeau was asked about the Company's reliance on Medicare revenues for Acthar. Trudeau indicated that Mallinckrodt's combined revenues for Medicare and Medicaid constituted roughly 25% of the Company's total revenues, and that the proportion of Acthar revenues attributable to Medicare and Medicaid was "*a little higher* than that." Emphasis Added.

12.     One month later, on November 9, 2015, the truth about the Company's dependence on Medicare and Medicaid for Acthar revenue began to surface when Citron Research ("Citron") issued a statement on Twitter comparing Mallinckrodt to Valeant Pharmaceuticals International, Inc. ("Valeant" or "VRX"), a Company whose stock price had recently plummeted 30% after Citron accused it of fraud. Valeant subsequently received subpoenas from the U.S. Attorney's Office for the District of Massachusetts and the United States Attorney for the Southern District of New York in regards to an investigation on Valeant's "drug pricing, distribution and patient assistance program." In the wake of the Citron comment, Mallinckrodt's stock price fell 17% from

a close of $69.89 per share on November 6, 2015, to close at $58.01 per share on November 9, 2015.

13.     The truth about the Company's dependence on Medicare and Medicaid for Acthar revenue continued to be revealed on November 16, 2016, when Citron published a full research report (the "Citron Report") accusing Defendant Trudeau and the Company of securities fraud in connection with Defendant Trudeau's October 6, 2015 statements downplaying the Company's reliance on Medicare and Medicaid for Acthar revenue. The Citron Report revealed that, based on information published by the Centers for Medicare and Medicaid Services ("CMS") on November 14, 2016, Medicare paid approximately $504 million and Medicaid paid $144.6 million for Acthar in 2015, collectively amounting to 61.32% of Mallinckrodt's total Acthar revenue in 2015. Individually, Medicare paid approximately 48% of Mallinckrodt's 2015 revenue from Acthar.

14.     These numbers, Citron alleged, demonstrated that Defendant Trudeau lied when he indicated that Medicare constituted only "a little bit higher" than 25% of Acthar sales. Going even further, Citron's principal short-seller Andrew Left plainly accused Defendant Trudeau of securities fraud, stating in relevant part: "Mallinckrodt CEO Mark Trudeau has been caught red handed committing securities fraud — exposed by none other than the newly released Medicare drug-spending dashboard." In the wake of the Citron Report, Mallinckrodt's stock price fell 18.4% from a close of $67.80 per share on November 15, 2016, to close at $55.32 per share on November 17, 2016.

15.     Only days later, on November 29, 2016, Defendant Trudeau was forced to admit the Company's previously understated reliance on Medicare and Medicaid for Acthar revenue. Specifically, during a conference call with investors on this date, Trudeau admitted that "Acthar now represents a significantly greater proportion of our operating income than one-third." And

only the following day, the Company effectively conceded the falsity of Defendant Trudeau's October 6, 2015 statements, telling investors at a Piper Jaffray Healthcare conference that its reimbursement level from Medicare alone was in the "mid-40s." On this news, Mallinckrodt's stock price declined 9.1% from a close of $57.67 per share on November 28, 2016, to close at $52.42 per share on November 29, 2016.

16.     Finally, the truth about the Company's anticompetitive and unlawful efforts to prevent an alternative ACTH treatment from reaching the U.S. market was revealed on January 18, 2017, when the United States Federal Trade Commission ("FTC") announced that Mallinckrodt had agreed to pay $100 million in connection with a joint settlement with the FTC and several states related to charges that it had acquired Synacthen from Novartis to secure and perpetuate its own monopoly. As part of the settlement, Mallinckrodt also agreed to license Synacthen to a competitor. The news of the settlement, and the fact that Mallinckrodt would lose its ACTH monopoly in the U.S., caused the Company's stock price to decline 5.85% from a close of $49.42 per share on January 17, 2017, to close at $46.53 per share on January 18, 2017.

## JURISDICTION AND VENUE

17.     The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

19.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render

the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District.  Specifically, the settlement between the FTC and Mallinckrodt was filed in this District.  *See* Joint Mot. for Entry of Stipulated Order for Perm. Inj. & Equitable Monetary Relief, *Federal Trade Comm'n, et al. v. Mallinckrodt ARD Inc., et al.*, No. 1:17-cv- 00120, ECF No. 2 (D.D.C. Jan. 18, 2017).

## PARTIES

21.     Plaintiff Patel purchased Mallinckrodt securities as set forth herein and in his certification filed herewith.

22.     Mallinckrodt is a public limited company organized in Ireland and based in Staines-upon-Thames, England. Mallinckrodt's U.S. headquarters are located in St. Louis, Missouri. The Company develops, manufactures, and distributes specialty pharmaceutical products and reported over $3.3 billion in net sales for fiscal year 2016.

23.     Defendant Trudeau has been the President, CEO, and a director of Mallinckrodt since June 2013. Trudeau, because of his position in the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Trudeau was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

24.     Moreover, because of his position and access to material non-public information available to him, Trudeau knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. Trudeau is liable for the false statements pleaded herein because he made, or caused to be made, all the false statements pleaded herein.

25.     Mallinckrodt and Defendant Trudeau are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.   Mallinckrodt Operates a Monopoly for Years Undetected

26.     Mallinckrodt is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri. Mallinckrodt acquired Questcor on August 14, 2014, for approximately $5.9 billion. At that time, Acthar was the only drug product sold by Questcor. With Mallinckrodt's acquisition, Questcor became a wholly owned subsidiary of Mallinckrodt and subsequently changed its corporate name from Questcor Pharmaceuticals, Inc. to Mallinckrodt ARD Inc. Acthar is a treatment for 19 different conditions, including infantile spasms, and difficult-to-treat autoimmune and inflammatory conditions, and is currently the only ACTH treatment in the United States approved by the FDA.

27.     Considerably, while there are millions of patients and various conditions treated by ACTH treatments, the world market for ACTH is dominated by just two companies – Novartis and Mallinckrodt. In Europe, Canada, and other parts of the world, doctors treat patients suffering from ACTH-treatable conditions with Synacthen, a synthetic ACTH drug marketed by Novartis. In 2011, however, Novartis decided to sell the rights to market Synacthen in the United States

which garnered the interest of dozens of companies and at least three firms which submitted formal offers, and near-final agreements.

28.     According to the FTC, each alternative bidder for Synacthen expected to profitably sell Synacthen at a price well below Acthar's price, demonstrating that Acthar was priced at a supra-competitive level. What is more, with anticipated FDA approval, each alternative bidder expected to capture a significant share of the U.S. ACTH market from Mallinckrodt by pricing Synacthen well below Acthar. Having the requisite pharmaceutical expertise and financing, the three particularly interested firms independently conducted due diligence, crafted business plans and regulatory approval strategies, and took other affirmative steps in furtherance of developing Synacthen for the U.S. market.

29.     In October 2012, Questcor learned that at least one unidentified firm was attempting to acquire Synacthen from Novartis and develop it for the United States. Questcor immediately attempted to reach Novartis and shortly thereafter signed a confidentiality agreement with Novartis and submitted an offer for Synacthen. By the spring of 2013, all three of the alternative bidders had submitted offers for Synacthen, with plans to develop and launch Synacthen in the United States in direct competition with Acthar. The offers by the three alternative bidders were comparable in value and structured similarly, and included an upfront payment, milestone payments upon FDA approval, and significant royalties on U.S. Synacthen sales.

30.     On June 11, 2013, however, Questcor and Novartis entered into a Licensing Agreement, Asset Purchase Agreement, and Supply Agreement (collectively, "the Agreements"), pursuant to which Questcor gained the exclusive rights to develop, market, and sell Synacthen in the United States and over thirty-five other countries. Under the Agreements, Questcor is obligated to pay a minimum of $135 million, and likely will pay $300 million to Novartis for Synacthen.

The Agreements, therefore, effectively solidified Questcor's (later Mallinckrodt's) monopolization of the U.S. market for ACTH treatments.

31.     Thereafter, Questcor and later Mallinckrodt repeatedly increased the price of Acthar 85,000% from $40 per vial in 2001, to over $34,000 per vial in 2017. More specifically, Questcor has repeatedly and profitably raised Acthar's price substantially over the last decade. On August 27, 2007, Questcor increased the price of Acthar more than 1,300% overnight, from $1,650 to $23,269 per vial, causing its revenues to increase dramatically and its profits to soar. Additionally, Questcor and later Mallinckrodt has taken significant and profitable increases on eight occasions since 2011, pushing the price up another 46% to its current $34,034 per vial. As a result, Acthar net sales grew from $218 million in 2011 to more than $1 billion in 2015.

32.     As a result, Medicare spent more money per patient on Acthar than for any other drug in 2015, putting out $504 million for just 3,104 patients, according to the Medicare Drug Spending Dashboard.  These exorbitant prices figures make Acthar one of the most expensive drugs on the market, and currently the single most expensive drug reimbursed by both Medicare and Medicaid.  Mallinckrodt is able to charge such exorbitant prices by targeting Acthar, as Defendant Trudeau has acknowledged, as "the only alternative for patients that have tried and failed on many other therapies."

33.     Despite the obvious exploitive effects of such a monopoly on consumers and United States payers, the monopoly has provided a substantial boon to the Company's bottom line year-over-year.  Throughout the Class Period, Defendants reported impressive revenue, operating profit growth and sales growth, and informed investors that Acthar accounted for 34 percent of Mallinckrodt's $3.4 billion in net sales for fiscal 2016.  All the while, however, Defendants knew that Mallinckrodt's aggressive pricing model produced unsustainable revenues, and its inflated

earnings and forecasts concealed the true extent of the pricing pressures the Company was experiencing and the exposure of Acthar to reimbursement rates by Medicare and Medicaid.

**II.     Mallinckrodt Makes Material Misrepresentations and Omissions during the Class Period**

34.     Since November 25, 2014, Mallinckrodt and certain of its officers and directors have misrepresented the efficacy of its business model, its ability to maintain sustainable revenue, and its exposure to reimbursement rates by Medicare and Medicaid. For example, on November 25, 2014, the Company stated in its 2014 10-K filed that Acthar "has limited direct competition *due to the unique nature of the product*." Emphasis Added. The 2014 Form 10-K also stated that, with the exception of Acthar's indication for treatment of infantile spasms, "Acthar is not subject to patent or other exclusivity" and that "*Acthar's commercial durability therefore relies partially upon product formulation trade secrets, confidentiality agreements and trademark and copyright laws*." Emphasis Added.

35.     These statements and similar statements were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that Acthar's "limited direct competition" and "commercial durability" was in fact due to Questcor's illegal anticompetitive conduct in preventing a synthetic version of ACTH to reach the U.S. market, a practice that Mallinckrodt initially followed, but later would later be forced to abandon.

36.     With respect to Medicare and Medicaid reimbursement levels, the 2014 10- K falsely warned that "federal and state governments may continue to enact measures in the future aimed at containing or reducing payment levels for prescription pharmaceuticals paid for in whole or in part with government funds. We cannot predict the nature of such measures, which could

have material adverse consequences for the pharmaceutical industry as a whole and, consequently, also for us." These and similar purported warnings created a materially false and misleading impression of the true nature of, and specific risks to, Mallinckrodt due its exposure to Medicare and Medicaid reimbursement levels.

37.    Indeed, as the Citron Report later revealed on November 16, 2016, Medicare spending in 2014 on Acthar totaled over $391 million, representing over 45% of Acthar sales. The Report further revealed that combined 2014 Medicare and Medicaid spending on Acthar was over $518 million, representing over 60% of Acthar sales. Therefore, the Company faced extreme exposure to reductions in reimbursement levels by these programs. As a result, the Company's statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

38.    Nevertheless, these overtly positive representations continued in Form 10-Q's, Form 8-K's, and Company press releases filed or issued throughout the Class Period. Each of these documents were signed and certified as accurate by Defendant Trudeau.

39.    For instance, on October 6, 2015, Mallinckrodt held a guidance call with investors during which Trudeau touted growth in Acthar sales, and described Acthar as one of the Company's "key initiatives." Trudeau further stated that one of the "key levers" to Acthar sales growth was "further developing key payer relationships." Considerably, given the growing controversy over prescription drug pricing, investors were concerned about the Company's exposure to potential reductions in reimbursement by federal prescription drug programs like Medicare. Thus one analyst, Jason Gerberry of Leerink Partners, specifically asked: "What is your Acthar exposure to Medicare?" In response, Trudeau stated:

> So with regards to your question on Medicare exposure to Acthar, a couple of things. One, *if we look at our overall business, the combined proportion of our*

*business that goes through Medicare and Medicaid combined it's about a quarter of our business, roughly. Acthar is maybe a little higher than that. But in general, our business is about a quarter*.

Emphasis Added.

40.     Shortly after Trudeau's October 6, 2015 comments, on November 9, 2015, Citron issued a statement on Twitter that compared Mallinckrodt to Valeant, and specifically targeted the Company's reimbursement levels, including from Medicare and Medicaid. The Citron comment stated that "[a]t these prices $MNK has signif more downside than $VRX-- far worse offender of the reimb sys - more to follow. VRX can't live in a vacuum." In the wake of the Citron comment, Mallinckrodt's stock price fell 17% from a close of $69.89 per share on November 6, 2015, to close at $58.01 per share on November 9, 2015.

41.     Notably, the decline in Mallinckrodt's stock price was tempered by the Company's false assurances to investors on November 9, 2015 that "we are fully confident in our business model and remain focused on executing on our long-term growth strategy." And shortly thereafter, on November 24, 2015, the Company filed its 2015 Form 10-K (the "2015 10-K"), in which it again stated that Acthar "has limited direct competition due to the unique nature of the product" and that "Acthar's commercial durability . . . relies partially upon product formulation trade secrets, confidentiality agreements and trademark and copyright laws." The 2015 10-K also contained similar risk disclosures as the 2014 10-K.

42.     At all relevant times, these statements were false and misleading because Mallinckrodt's business model involved a combination of aggressive pricing and monopolization that would ultimately reveal to be unsustainable and subject the Company to multiple government probes and investigations. Specifically, Defendants failed to disclose that the Company's "business model" and "long term growth strategy" was actually contingent on illegal, anticompetitive

14

conduct in preventing a synthetic version of ACTH to reach the U.S. market, a practice that Mallinckrodt would later be forced to abandon.

43.     Moreover, as the Citron Report revealed on November 16, 2016, the percentage of Acthar sales for 2014 attributable to Medicare alone was over 45%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid was over 60%. Furthermore, Defendants failed to disclose that the total percentage of Acthar sales attributable to Medicare increased in 2015, with sales attributable to Medicare alone totaling 48%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid totaling 61%. As a result, Trudeau's statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

III.    **The Market Finally Learns the Truth Regarding Mallinckrodt's Unsustainable Business Model**

44.     The truth regarding the efficacy of the Company's business model, its ability to maintain sustainable revenue, and its exposure to reimbursement rates by Medicare and Medicaid, was ultimately revealed to the market through a series of partial disclosures between November 16, 2016 and February 18, 2017.  On November 14, 2016, CMS released updated drug pricing data for 2015 which revealed that: (i) Medicare spending on Acthar had increased from approximately $391 million in 2014, to approximately $503 million in 2014, an increase of over 28%, and (ii) combined Medicare and Medicaid spending on Acthar increased from approximately $518 million in 2014, to approximately $648.5 million in 2015, an increase of over 25%.

45.     These figures were summarized and reflected in the November 16, 2016 Citron Report, which analyzed the 2015 CMS drug pricing data and concluded that Trudeau's statements on October 6, 2015 regarding the percentage of Acthar sales attributable to Medicare were false. The Citron Report revealed to the market (for the first time) that, contrary to Defendant Trudeau's

statements that the percentage of 2015 Acthar sales attributable to Medicare was "maybe a little bit higher than" 25%, the percentage was actually over 48%, with the percentage of Acthar sales attributable to both Medicare and Medicaid totaling over 61%. The Citron Report accused Trudeau and the Company of securities fraud for misleading investors about the Company's exposure to government prescription drug programs. After publication of the Citron Report, Mallinckrodt's stock price fell 18.4% from a close of $67.80 per share on November 15, 2016, to close at $55.32 per share on November 17, 2016.

46.     Only days later, on November 29, 2016, Mallinckrodt released its fourth quarter 2016 earnings results, and held a conference call with investors. In his opening remarks, Trudeau acknowledged that "[a]s we expand patient access [to Acthar] in pulmonology and rheumatology, our patient mix has shifted more toward older patients, many of whom are covered by Medicare." Trudeau also admitted that "Acthar now represents a significantly greater proportion of our operating income than one-third." During the call, analysts questioned the Company's dependence on Medicare for Acthar revenue in light of the recently revealed data:

> Analyst [Marc Goodman (UBS)]: For Acthar, just helps [sic] us understand better how much of the [commercial payer] contracting has already kicked in and is impacting the business so far. I'm just trying to understand, you keep increasing commercial contracting, yet the Medicare piece of the business is going up. I heard you comment about the older patients with these indications that seem to be growing. So I understand that part. But I just don't understand why that piece of the business is increasing so fast and yet the commercial business is increasing so fast.

47.     Analysts also highlighted Defendant Trudeau's earlier misleading statements about the Company's Medicare exposure with Acthar. For example, Gregg Gilbert of Deutsche Bank noted that "on the amount of Acthar business that's paid for by the government," there has "obviously been some controversy in the market . . . about your potential mischaracterization of the channel mix." In response to these and similar inquiries from analysts, Hugh O'Neill

("O'Neill"), an Executive Vice President and President of Autoimmune & Rare Diseases at the Company, noted that "[a]s it relates to the shift in the payer mix," "there's nothing here that's happening I think that we were surprised by."

48.     Mr. O'Neill's statements therefore effectively confirmed that the Company knew about the increase in Medicare payments for Acthar and that Defendant Trudeau's October 6, 2015 statements were false when made. Indeed, only the next day, the Company explicitly confirmed the falsity of Defendant Trudeau's October 6, 2015 statements, telling investors at a Piper Jaffray Healthcare conference that its reimbursement level from Medicare alone was in the "mid-40s." Specifically, O'Neill stated: "Our portfolio has shifted a little bit into the mid-40s as it relates to Medicare reimbursement for the product versus where it was a year and a half, two years ago which was more in that low, mid-30s."

49.     The news of the Company's increasing exposure to Medicare from Acthar, which it now acknowledged represented "a significantly greater proportion of our operating income than one-third," caused Mallinckrodt's stock price to decline an additional 9.1% from a close of $57.67 per share on November 28, 2016, to close at $52.42 per share on November 29, 2016.

50.     The truth about the Company's anticompetitive and unlawful efforts to maintain its monopoly on Acthar by preventing a synthetic ACTH treatment from reaching the U.S. market was subsequently revealed on January 18, 2017, when the FTC announced that Mallinckrodt had agreed to a joint settlement with the FTC and several states. As part of the settlement, Mallinckrodt agreed to pay $100 million, and more importantly, agreed to license Synacthen to a competitor to pursue FDA approval for two of Acthar's primary indications, infantile spasms and nephrotic syndrome. The FTC press release stated in relevant part:

> Mallinckrodt ARD Inc., formerly known as Questcor Pharmaceuticals, Inc., and its parent company, Mallinckrodt plc, have agreed to pay $100 million to settle Federal

Trade Commission charges that **they violated the antitrust laws when Questcor acquired the rights to a drug that threatened its monopoly in the U.S. market for adrenocorticotropic hormone (ACTH) drugs**. Acthar is a specialty drug used as a treatment for infantile spasms, a rare seizure disorder afflicting infants, as well a drug of last resort used to treat other serious medical conditions.

The FTC's complaint alleges that, **while benefitting from an existing monopoly over the only U.S. ACTH drug, Acthar, Questcor illegally acquired the U.S. rights to develop a competing drug, Synacthen Depot. The acquisition stifled competition by preventing any other company from using the Synacthen assets to develop a synthetic ACTH drug, preserving Questcor's monopoly and allowing it to maintain extremely high prices for Acthar**.

"**Questcor took advantage of its monopoly to repeatedly raise the price of Acthar, from $40 per vial in 2001 to more than $34,000 per vial today – an 85,000 percent increase**," said FTC Chairwoman Edith Ramirez. "We charge that, to maintain its monopoly pricing, it acquired the rights to its greatest competitive threat, a synthetic version of Acthar, to forestall future competition. **This is precisely the kind of conduct the antitrust laws prohibit**."

Acthar is a specialty drug used as a treatment for infantile spasms, a rare seizure disorder afflicting infants, and a drug of last resort to treat several other serious medical conditions – including nephrotic syndrome, flare-ups of multiple sclerosis, and rheumatoid disorders. According to the complaint, Acthar treatment for an infant with infantile spasms can cost more than $100,000.

In Europe, Canada, and other parts of the world, the complaint notes that doctors treat patients suffering from these conditions with Synacthen Depot, which is available at a fraction of Acthar's price in the United States. The complaint alleges that Questcor has consistently viewed Synacthen Depot as a significant competitive threat to its Acthar monopoly in the United States.

**The FTC alleges that in June 2013, Questcor acquired the U.S. rights to Synacthen from Novartis AG, outbidding several other companies that were seeking to acquire the rights to Synacthen. Those alternative bidders were interested in developing the drug and had plans to sell it at a significant discount to Acthar's price, capturing a substantial amount of Questcor's business. The FTC charges that Questcor's acquisition of Synacthen stifled competition and eliminated the possibility that an alternative bidder would make the drug available in the U.S. market and compete with Acthar**.

In addition to the $100 million monetary payment, the proposed stipulated court order requires that Questcor grant a license to develop Synacthen Depot to treat infantile spasms and nephrotic syndrome to a licensee approved by the Commission.

A monitor will ensure that Questcor complies with its obligation to grant the license within 120 days of the entry of the order; after that time, a trustee will be appointed to effectuate the license. The order also requires Questcor to provide periodic reports on its efforts, and provide the Commission with advance notice of any future acquisitions of U.S. rights to ACTH drugs.

The states of Alaska, Maryland, New York, Texas and Washington joined in the FTC's complaint. Under the settlement, the states will receive $10 million from the $100 million judgment and an additional $2 million as payment for attorney's fees and costs.

Emphasis Added.

51.     The FTC press release noted that the Commission vote authorizing staff to file the complaint and the proposed stipulated order in federal court was 3-0 and referenced a concurring statement issued by FTC Commissioner Maureen K. Ohlhausen.  That statement provided in relevant part:

Competition in healthcare markets, including pharmaceuticals, is vital for U.S. consumers. Thus, I have strongly supported the Commission's long-standing, bi-partisan work to protect competition in healthcare. But, as the Supreme Court has recognized "[t]he opportunity to charge monopoly prices at least for a short period is what attracts business acumen in the first place; it induces risk taking that produces innovation and economic growth." Competition officials must allow a company to profit from its innovation, while preventing anticompetitive actions to unlawfully obtain or maintain a monopoly. Standing alone, a "high" pharmaceutical price is not an antitrust violation if it simply reflects a legally obtained intellectual property right. Antitrust comes into play when a firm lifts a competitive constraint on its market power, such as by acquiring a competitor or engaging in a pay-for-delay agreement. Likewise, in some circumstances, an action by a monopolist to block a nascent threat to its monopoly can violate antitrust law.

***I voted to accept the proposed consent in this matter because I have reason to believe that Mallinckrodt ARD Inc.—formerly known as Questcor Pharmaceuticals, Inc., and its parent company Mallinckrodt plc—violated the antitrust laws by acquiring the rights to the drug Synacthen Depot in the United States to protect its H.P. Acthar Gel monopoly***. To restore competition, Questcor will divest rights to Synacthen Depot, and related assets, to a competitor committed, and already working to develop, a synthetic ACTH drug. This remedy will make a competitive drug option to Acthar more likely, thus decreasing prices and increasing availability for patients. As part of the consent, however, Questcor also will pay more than $100 million in disgorgement.

Emphasis Added.

52.     On this news, the price of Mallinckrodt common stock declined 5.85% from a close of $49.42 per share on January 17, 2017, to close at $46.53 per share on January 18, 2017.

## ADDITIONAL SCIENTER ALLEGATIONS

53.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Mallinckrodt, their control over, and/or receipt and/or modification of Mallinckrodt's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Mallinckrodt, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

54.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Mallinckrodt's securities and operated as a fraud or deceit on Class Period purchasers of Mallinckrodt securities by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Mallinckrodt's securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Mallinckrodt securities during the Class Period,

Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

<b>APPLICATION OF PRESUMPTION OF RELIANCE:<br>FRAUD-ON-THE-MARKET DOCTRINE</b>

55.    At all relevant times, the market for Mallinckrodt's securities was an efficient market for the following reasons, among others:

a)    Mallinckrodt securities met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b)    Mallinckrodt filed periodic public reports with the SEC and the NYSE; and

c)    Mallinckrodt regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

56.    As a result of the foregoing, the market for Mallinckrodt's securities promptly digested current information regarding Mallinckrodt from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of Mallinckrodt securities during the Class Period suffered similar injury through their purchase of Mallinckrodt securities at artificially inflated prices and a presumption of reliance applies.

<b><u>NO SAFE HARBOR</u></b>

57.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when

21

made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Mallinckrodt who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

58. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Mallinckrodt securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

59. The members of the Class are so numerous that joinder of all members is impracticable, since Mallinckrodt has millions of shares outstanding and because the Company's shares were actively traded on the NYSE. While the exact number of Class members in unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

60.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a)     whether the Exchange Act was violated by Defendants;

(b)      whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e)     whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)     whether the price of Mallinckrodt securities was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of Mallinckrodt's shares when the truth was revealed, and if so, what is the appropriate measure of damages.

61.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

62.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

63.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of Section 10(b) of**
**the Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

64.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

65.     This Count is asserted by Plaintiff on behalf of themselves and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

66.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Mallinckrodt's shares; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Mallinckrodt's shares at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

67.     Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain

artificially high market prices for Mallinckrodt's shares in violation of Section 10(b) of the Exchange Act and Rule 10-5.

68.    As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.  Defendants' material misrepresentations and omissions as set forth herein violated that duty.

69.    Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class.  Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

70.    As a result of Defendants' fraudulent activity, the market price of Mallinckrodt shares was artificially inflated during the Class Period.

71.    In ignorance of the true financial condition of Mallinckrodt, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Mallinckrodt containing the misleading information, purchased or otherwise acquired Mallinckrodt's shares at artificially inflated prices during the Class Period.

72.    Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Mallinckrodt's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding

the Company. Plaintiff and other members of the Class purchased Mallinckrodt's shares in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of Mallinckrodt's shares through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Mallinckrodt.

73.    Throughout the Class Period, Defendants were aware of material non-public information concerning Mallinckrodt's fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

74.    As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Mallinckrodt common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**(Against Defendant Trudeau)**

75.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

76.    During the Class Period, Defendant Trudeau was privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to him in connection therewith. Because of his possession of such information, Defendant Trudeau knew or recklessly disregarded the fact that adverse facts

specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

77.     Defendant Trudeau was involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. Defendant Trudeau was aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  Throughout the Class Period, Defendant Trudeau was able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements.  Defendant Trudeau was provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

78.     Defendant Trudeau was also able to, and did, directly or indirectly, control the conduct of Mallinckrodt's business, the information contained in its filings with the SEC, and its public statements. Moreover, Defendant Trudeau made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of his position and access to material non-public information available to them but not the public, Defendant Trudeau knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, Defendant Trudeau is responsible for the accuracy of Mallinckrodt's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

79.     Defendant Trudeau acted as a controlling person of Mallinckrodt within the meaning of Section 20(a) of the Exchange Act. By reason of his position with the Company, Defendant Trudeau had the power and authority to cause Mallinckrodt to engage in the wrongful conduct complained of herein. Defendant Trudeau controlled Mallinckrodt and all of its employees. As alleged above, Mallinckrodt is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  By reason of his conduct, Defendant Trudeau is liable pursuant to section 20(a) of the Exchange Act.

80.     As a direct and proximate result of the wrongful conduct of Mallinckrodt and Defendant Trudeau, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

(A)     Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and her counsel as Class counsel;

(B)     Awarding Plaintiff and the members of the Class damages, including interest;

(C)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(D)     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  January 26, 2017                        **LEVI & KORSINSKY LLP**

                                                _/s/_ Nicholas I. Porritt
                                                Nicholas I. Porritt (D.C, Bar No. 457611)
                                                1101 30th Street, N.W., Suite 115
                                                Washington, D.C. 20007
                                                Tel.: (203) 992-4523
                                                Fax: (212) 363-7171
                                                Email: nporritt@zlk.com

                                                     - and -

                                                Shannon L. Hopkins*
                                                Sebastiano Tornatore*
                                                Meghan K. Daley*
                                                733 Summer Street, Suite 304
                                                Stamford, Connecticut 06901
                                                Tel.: (203) 992-4523
                                                Fax: (212) 363-7171
                                                Email: shopkins@zlk.com
                                                        stornatore@zlk.com
                                                        mdaley@zlk.com

                                                *pro hac vice* forthcoming